IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

GABRIEL DEL REAL TORRES,        )
                                )
Plaintiff,                      )
                                )
vs.                             )    NO. 3:11-CV-035
                                )
BREMEN CASTINGS, INC.           )
                                )
Defendant.                      )

## OPINION & ORDER

This matter is before the Court on the Motion for Summary Judgment, filed by Defendant on February 22, 2012. (DE #23.) For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED**. The Clerk is **ORDERED** to **DISMISS THIS CASE WITH PREJUDICE**.

BACKGROUND

Gabriel Del Real Torres ("Plaintiff") filed a complaint on January 24, 2011, alleging that Bremen Castings, Inc. ("Defendant") violated certain rights afforded to him under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e *et seq*. ("Title VII"). (DE #1.) Defendant filed the instant Motion for

Summary Judgment on February 22, 2012.  (DE #23.)  Plaintiff filed
a response on March 26, 2012.  (DE #26.)  Defendant filed a reply
on April 9, 2012 (DE #28.)  The Motion is now fully briefed and
ripe for adjudication.


DISCUSSION

The standards that generally govern summary judgment motions
are familiar.  Pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, summary judgment shall be granted "if the movant shows
that there is no genuine dispute as to any material fact and that
the movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a); *see also Nebraska v. Wyoming*, 507 U.S. 584, 590
(1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In
other words, the record must reveal that no reasonable jury could
find for the nonmovant.  *Karazanos v. Navistar Int'l Transp. Corp.*,
948 F.2d 332, 335 (7th Cir. 1991).  *See also Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In deciding a motion for
summary judgment, a court must view all facts in the light most
favorable to the nonmovant.  *Anderson*, 477 U.S. at 255; *Trade Fin.
Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406 (7th Cir. 2009).
According to Rule 56:

> A party asserting that a fact cannot be or is
> genuinely disputed must support the assertion
> by:
>     (A)citing to particular parts of materials
> in   the   record,   including   depositions,
> documents, electronically stored information,

> affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c). Furthermore, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . ." Fed. R. Civ. P. 56(e)(2),(3). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

Where a party bears the burden of proof on a particular issue, the party may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine dispute requiring a trial. *See Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 410 (7th Cir. 1988); *Hickey v. A.E. Stanley*

*Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993).  The Seventh Circuit has clarified that:

> [i]t is not the function of the court to scour the record in search of evidence to defeat a motion for summary judgment; we rely on the nonmoving party to identify with reasonable particularity the evidence upon which he relies.  The evidence relied upon must be competent evidence of a type otherwise admissible at trial.  Thus, a party may not rely upon inadmissible hearsay in an affidavit or deposition to oppose a motion for summary judgment.

*Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) (citations omitted).  Therefore, if a party fails to properly establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.  In this situation, there can be "no genuine dispute as to any material fact" because a complete failure of proof concerning an essential element of the nonmovants case necessarily renders all other facts immaterial.  *Celotex*, 477 U.S. at 323.


Facts

The material facts in this case are largely undisputed and will be noted as such where applicable.  Plaintiff, a Hispanic male, began working for Defendant, a manufacturer of machines castings, in October of 2000 as a Bench Grinder.  (DE #25-1, p. 14-15; DE #25-2, p. 2; DE #27, p. 2.)  Written safety procedures and rules are set in place at the manufacturing plant, including an

-4-

immediate injury-reporting requirement, and Plaintiff was aware of those rules and requirements.  (DE #25-2, p. 3, 13, 17, 19-23, 25; DE #25-1, p. 9-11.)  For example, employees are required to report all work related injuries and accidents to supervisors immediately, "even when a doctor does not need to be consulted."  (DE #25-2, p. 17.)  Defendant's safety focus guidelines instruct employees to "remember to report immediately even if you're just sore" and reiterate that "ALL Accidents/Incidents, Injuries, and Near Misses should be reported."  (DE #25-2, p. 21, 23.)  Defendant also has a policy in place that three violations of the rules may result in an employee's discharge.  (DE #25-2, p. 2.)[1]

Defendant has given "at least three employees, two of whom are Hispanic, written warnings for failure to timely report a safety violation."  (DE #25-2, p. 5; DE #25-2, p. 35-37.)  However, none of those employees were terminated because they did not commit three violations within a six month period.  (DE #25-2, p. 5.)  Conversely, Defendant did terminate "at least three other Grinders who committed three violations of [Defendant's] work rules in six

---

[1] The "Shop Rules and Regulations" also state that "[a]ny violation of any of the . . . rules and regulations will subject the violating employee with the disciplinary action that the Company deems appropriate in accordance with the offense and under the circumstances that the offense was committed. Furthermore, the listing of these specific rules of conduct and penalties does not affect or limit the Company's right to take such disciplinary action as it deems appropriate in other cases of misconduct not so listed.  Generally, such disciplinary action includes written warnings, suspension, discharge, and such other appropriate remedial actions as are deemed just and reasonable under the circumstances."  (DE #25-2, p. 11.)

months that rose to the level of a written warning." (DE #25-2, p. 5.)

On August 8, 2007, Plaintiff injured his lower back while at work. (DE #25-1, p. 25-26.) He was on medical leave immediately following the injury but returned to light-duty work soon afterwards, and Plaintiff's doctor released him to work without any restrictions by February 6, 2008. (DE #25-1, p. 28-29; DE #27, p. 1.) The fax from Plaintiff's physician to Defendant dated February 6, 2008, states Plaintiff's work status as "[r]eturn to work immediately (with regular duties)." (DE #25-4, p. 3.) In his affidavit,[2] Plaintiff states that since his return, he has been a "qualified individual with a disability" and that his "said medical disability condition was apparent to [Defendant] and accommodated by [Defendant]" until he was terminated. (DE #27, p. 2.) Plaintiff does not claim (nor does he present any evidence) that he was under any restrictions from a physician or otherwise from February 6, 2008, to and through the time of his termination. (DE #25-1, p. 64.)

In his affidavit, Plaintiff states that he "satisfactorily performed [his] required employment duties notwithstanding [his] aforementioned lower back disability condition." (DE #27, p. 2.) However, Defendant points out that, during his deposition,

---

[2] The Court notes that Plaintiff's affidavit was created and signed on March 26, 2012, long after he gave his deposition on September 14, 2011.

Plaintiff acknowledged that: (1) he was aware of the expected 80% productivity standard; (2) that in January of 2010 he received verbal warnings from his supervisor that his grinding rates needed to improve; and (3) that his rates were as low as "66 or 67 and then one time it went down to 30, 35 or 45 percent." (DE #25-1, p. 20, 33-34.)  Plaintiff also testified that he was consistently told to increase his production rates, both before and after his lower back injury.[3]  (DE #25-1, p. 21.)

On February 8, 2010, Plaintiff received a written warning for failing to use the company's selected doctor to treat a work related injury as per company policy; he also attended a meeting with Stan Hueni, the Employee Relations Manager, and Carol Senour, the Director of Human Resources, regarding that warning . (DE #25-1, p. 38-39.)  During the meeting, Plaintiff was reminded that he was obligated to report work related injuries in a timely manner. (DE #25-2, p. 4.)  The written warning itself, which was signed by Plaintiff, describes that Plaintiff did not follow proper procedures and additionally states: "Gabriel - any time you are hurt on the job, you must see Human Resources to get an appointment with the company's doctor.  If you are not satisfied with your treatment, you must notify Human Resources immediately." (DE #25-2, p. 29.)

---

[3]    "Q: So every year that you were employed at BCI someone told you that you needed to increase your production.
A: Yes." (DE #25-1, p. 21.)

On February 16, 2010, Plaintiff received and signed another written warning stating that his "grinding rates for February 8-13 were 42% and that is not satisfactory. The standard is 80%." (DE #25-2, p. 31.) The warning goes on to state:

> Gabriel - This is your second active written warning which means that **your job is on the line until 8/8/10**. Any violation of any work rule will result in your termination. This includes your grinding numbers for this week must be above 62% which you achieved January 25-29. You must do this without hurting yourself. Safety must always be your number one priority!

(DE #25-2, p. 31.) Plaintiff contends that it was his "clear understanding" based on the written warning that he was on a probationary period until August 8, 2010. (DE #27, p. 2.) Plaintiff testified that he met with Stan Hueni regarding the warning and that they also discussed his back. (DE #25-1, p. 42-43.) The following exchange took place at the deposition:

> Q: And during the meeting where you were given [the written warning], did you tell Stan that you had felt pain in your back when pushing your weight into a stone a few days earlier?
>
> A: Well, at that time I wasn't by the stones, I was actually grinding. But they were making some heavy parts there.
>
> Q: Okay. And my only question is: Did you tell Stan that you hurt your back during this conversation on February 16, 2010.
>
> A: Yes, I told him.
>
> Q: And did you tell him that you had hurt your back a few days before the conversation?

-8-

> A: Well, the pain has always been there.  But,
> actually, the day before of me – we were
> actually working with heavy parts, and I went
> home feeling tired and achy and sore from the
> heavy parts.  So that day it was Stan and
> Pedro [Lopez] that was there – I don't know if
> Dale was there or not – and I was explaining
> to them that that had happened.  So that day
> they had actually had me working with the big
> parts that went to the quality section, with
> the hundred percent, those were returned back.
> So then they changed us from that line to the
> other so that we can complete, or finish, the
> parts, to make sure that they were okay.  So
> then when they told me about this, that why
> didn't I do what I was supposed to do, that's
> – you know I was telling them that I was not
> feeling well.

(DE #25-1, p. 132-33.)  In his affidavit, Stan Hueni states that he

was "shocked and upset" to learn that Defendant had again violated

the immediate-reporting requirement, especially since Plaintiff had

been reminded of the policy at the meeting the week before.  (DE

#25-2, p. 4.)  Stan Hueni indicates that this violation "rose to

the level of a written warning."  (DE #25-2 p. 4.)  Subsequently,

Stan Hueni consulted with Carol Senour about the incidents, and she

made the decision to terminate Plaintiff's employment.  (DE #25-2,

p. 5.)  Plaintiff was given a letter dated February 18, 2010, which

states:

> It was necessary to terminate your employment
> . . . because you had two active written
> warnings which put your job on the line.  You
> then had a safety violation when we became
> aware that you hurt yourself while stand
> grinding and by your own admission did not
> tell anyone.  Pedro Lopez was both witness and
> translater (sic) to this issue.  You are well
> aware of the necessity to report an injury

immediately and have been advised of this numerous times.

(DE #25-2, p. 5, 33.)  In his affidavit, Plaintiff denies that he injured himself while stand grinding and further denies that he "did not tell anyone" about the "non-event."  (DE #27, p. 3.)

When asked about his Title VII claims during the deposition, the following exchange took place:

> Q: And I understand from this Complaint that you're claiming that [Defendant] discriminated against you because of your national origin, correct?
>
> A: Yes.
>
> Q: Okay.  So does that mean you believe [Defendant' discriminated against you because you're from Mexico?
>
> A: I don't think so.  But I believe that – I don't think so.  But I believe it's because I had gotten hurt and I wasn't able to produce what they wanted.
>
> Q: Do you think anybody at [Defendant] had a problem with you because you're Hispanic?
>
> A: Well, no.  I mean, there was a guy there. But, I mean, is it – I don't think it's because I was talking Spanish, no.
>
> Q: Did any managers ever say or do anything to suggest they didn't like you because you're Hispanic?
>
> A: Not that I know of, no.

(DE #25-1, p. 53-54.)  Plaintiff also testified that his supervisors told both Caucasian and Hispanic employees to increase production.  (DE #25-1, p. 17-18.)

In his affidavit, Plaintiff claims that Stan Hueni discriminated against him on the basis of his national origin by selecting a translator named Pedro Lopez for the February 16, 2010, meeting. (DE #27, p. 4.) Plaintiff states that Pedro Lopez was being trained for a managerial position and therefore had a "motive for flawed translation" because Pedro Lopez was in a "conflicted position to gain from my termination, as he would be dually serving the managerial position of [Defendant] supervisors (including Stanley Hueni) while purportedly serving as my unbiased translator." (DE #27, p. 4.) He also notes that the February 16, 2010, meeting was not video or audio recorded. (DE #27, p. 4.) Plaintiff provides no additional information or evidence in support of his claim of national origin discrimination. In its reply brief, however, Defendant points out that Plaintiff was asked about Pedro Lopez during his deposition:

> Q: Do you have any facts or information suggesting that management wanted Mr. Lopez to give a flawed translation?
>
> A: No. I don't think so.
>
> Q: Do you have any facts or information suggesting that management knew Mr. Lopez gave a false translation?
>
> A: No, I don't know if they knew or – I don't know if they knew or not.

(DE #29-1, p. 3.)

Title VII Claims

   *National Origin Discrimination*

   Title VII prohibits employers from firing or otherwise discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of an employee's national origin.  See 42 U.S.C. §§ 2000e-2(a)(1).  A plaintiff alleging national origin discrimination may proceed either under the direct method of proof or under the indirect burden-shifting method familiarized by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972). See *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 702 (7th Cir. 2012).  Using the direct method, "[a] plaintiff must produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011).  The proffered evidence must "'point directly' to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (citation omitted).  A Plaintiff proceeding under the indirect method, on the other hand, must provide evidence that: (1) he is a member of a protected class; (2) he was meeting the employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably.  *Naficy v. Illinois Dept. of Human Services*, --- F.3d

-12-

----, 2012 WL 4070115, *5 (7th Cir. Sept. 18, 2012).  Once the plaintiff establishes a prima facie case, the defendant must then provide a legitimate, nondiscriminatory reason for the employment action.  *Id*.  At that point, a plaintiff can only avoid summary judgment by presenting evidence suggesting that the defendant's stated reason is pretextual.  *Id*.

Plaintiff cites the *McDonnell Douglas* method in reference to establishing a prima facie case of 'employment discrimination on the basis of disability' but fails to substantively provide any type of analysis on his Title VII claims; the Court can only assume that he is intending to bring his Title VII claims under the indirect method as well.  In any event, his claims clearly fail under the direct method, as Plaintiff points to no evidence in the record to suggest that his termination occurred because of his nationality.  The scattered references to Plaintiff's Hispanic origin and unsupported assertions that he was discriminated against do nothing to allow a reasonable inference to be made that Defendant's real reason for terminating Plaintiff was bound up with his nationality.  Furthermore, Plaintiff specifically testified at his deposition that he did not believe Defendant discriminated against him because he was from Mexico, that he didn't think anyone employed by Defendant had an issue with his nationality, and that no managers ever said or did anything to suggest that they didn't

-13-

like him because he was Hispanic.  His claim fails as a matter of law under the direct method of proof.

Under the indirect method, even assuming *arguendo* that Plaintiff is able to establish the first three elements of a prima facie case of national origin discrimination, his claim ultimately fails because he does not identify any similarly situated employee outside of the protected class who was treated more favorably.  In a section titled "Citations Relative to the *McDonnell Douglas Model*," Plaintiff references his own affidavit and that of Stan Hueni as establishing a "trio of similarly situated" co-workers "who were not ADA-disabled ('three employees, two of whom are Hispanic')."  However, the relevant portion of Stan Hueni's affidavit only establishes that three (unidentified) employees were given written warnings for failing to report a safety violation, but that they were not terminated because none of them had three rules violations.  Plaintiff's affidavit does not shed any light on the specifics of these or any other co-workers; he vaguely alleges that "at least one of [his] co-workers" was similarly situated with him, but he does not expand upon this contention.  In fact, Plaintiff fails to reference any similarly situated employee by name (or even by job description) and fails to provide any relevant details in support of his position.[4]  Simply put, the record does

---

[4] In his own affidavit, Plaintiff laments that the names of the employees have been redacted in the "written warnings" documents that Defendant attaches in support of its Motion for Summary Judgment.  However, Plaintiff's failure to conduct relevant and appropriate discovery of his own

not show that this vague "trio" of employees was similarly situated to Plaintiff, as Plaintiff does not provide any evidence whatsoever of a non-Hispanic employee with three violations who was not terminated.  See *Atanus,* 520 F.3d at 673 (a plaintiff must establish that "members of the comparative group are directly comparable to [him] in all material respects," and he can show that by providing evidence of "whether the employees reported to the same supervisor, whether they were subject to the same standards and whether they had comparable education, experience and qualifications") (internal quotation marks and citations omitted).

Had Plaintiff been able to establish a prima facie case, however, his claim would still fail.  Defendant has articulated a legitimate non-discriminatory reason for Plaintiff's termination: Plaintiff received two active written warnings, and it was subsequently discovered that he committed a safety violation because he was injured and failed to tell anyone.  In his response brief, Plaintiff cursorily states that the "clear instance" of national origin discrimination occurred when Defendant selected Pedro Lopez as a "patently biased translator" during the February 16, 2010, meeting and failed to preserve the meeting via audio or visual recording.  Although Plaintiff's argument is difficult to follow, he seems to suggest that Defendant's stated reason for

---

and provide it to the Court in support of his response brief is not the fault of Defendant.

termination is pretextual because Pedro Lopez was being trained for a managerial position at the time of the meeting and was thus biased against Plaintiff in some unspecified way. Because of such bias, Plaintiff asserts, Pedro Lopez provided Defendant with a flawed translation during the meeting. Plaintiff does not, however, describe what the flawed translation allegedly was nor how it affected the outcome of the meeting. In fact, when asked about Pedro Lopez during his own deposition, Plaintiff admitted that he had no evidence to suggest that management wanted Pedro Lopez to give a flawed translation or that management knew the translation was in fact incorrect. Even if the Court takes Plaintiff at his word that the translation was somehow flawed and that Defendant relied on the flawed translation to form the basis of his termination, Plaintiff has not provided any evidence to show that Defendant's reason for terminating him was pretextual rather than based on an honestly held belief that he had again failed to report a work-related injury. See *Stockwell v. City of Harvey*, 597 F.3d 895, 901-02 (7th Cir. 2010) (plaintiff "must show that the employer's reason is not credible or factually baseless" and must also "provide evidence that supports the inference that the real reason was discriminatory"); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) ("An employer's mistaken belief that the plaintiff's conduct merited termination is not unlawful, so long as the belief was honestly held."). See also *Grigsby v. LaHood*, 628

-16-

F.3d 354, 360 (7th Cir. 2010) (plaintiff must show pretext by a preponderance of the evidence). Finally, Plaintiff's argument that the fact that the meeting was not audio or video recorded shows "heightened" bias or animus is a non-starter. He does not provide any evidence, or even suggest in his affidavit for that matter, that Defendant had a policy of recording such meetings or that a recording of the meeting ever existed but was later concealed by Defendant. He does nothing to explain how this recording (or lack thereof) provides evidence of pretext in any way. See *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009) ("[U]nsupported and underdeveloped arguments are waived.") (citation and internal quotations omitted).

<u>ADA Claims</u>

Under the ADA[5], it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To be successful on an ADA claim, a plaintiff must show: "1) that she is disabled; 2) that she

---

[5] Although neither party specifically addresses the issue, the Court notes that because the alleged discrimination took place after January 1, 2009, the ADA Amendments Act of 2008 ("ADAAA") controls this case, and the Court will apply these standards accordingly. See *Powers v. USF Holland, Inc.*, 667 F.3d 815, 823, n. 7 (7th Cir. 2011).

is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation." *Feldman v. Olin Corp.*, ---F.3d----, 2012 WL 3641774, *3 (7th Cir. August 27, 2012) (citing *Stevens v. Illinois Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000)).  The Seventh Circuit has recognized distinct categories of discrimination claims under the ADA including failure to accommodate and disparate treatment. *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001); see also *Powers v. Holland*, 667 F.3d 815, 819 (7th Cir. 2011).  To succeed on either type of claim, a plaintiff must demonstrate that he is disabled under the meaning of the ADA.  "Merely having a physical injury or a medical condition is not enough." *Id.* (citing *Burnett v. LFW, Inc.*, 472 F.3d 471, 483 (7th Cir. 2006).

The ADA defines "disability" with respect to an individual as (A) "a physical or mental impairment that substantially limits one or more major life activities of such individual"; (B) "a record of such an impairment"; or (C) "being regarded as having such an impairment."  42 U.S.C. § 12102(1).

Plaintiff alleges in his complaint that he is a "qualified individual with a disability" and that his disability was "consistently accommodated" by Defendant for approximately two and a half years before he was terminated in "direct violation of the

-18-

'reasonable accommodation' provisions of the ADA." He reiterates this position in his response brief, and further asserts in his affidavit that his disability was "apparent to [Defendant], and accommodated by [Defendant]." Plaintiff's affidavit also states that Defendant "ceased to accommodate [his] lower back disability condition" when he was terminated.

### Failure to Accommodate

In order to succeed on a failure to accommodate claim under the ADA, "a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 747-48 (7th Cir. 2011) (citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)). As to the second prong, the Seventh Circuit has noted that it is the initial responsibility of the plaintiff to inform his employer of the disability at issue in a failure to accommodate claim. *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996) ("An employer that has no knowledge of an employee's disability cannot be held liable for not accommodating the employee."). With regard to the third prong, the parties must "engage in an interactive process to determine a reasonable accommodation." *Sears, Roebuck & Co.*, 417 F.3d at 797 (citing *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir.

1998)).  Recent case law provides that this interactive process consists of a give and take between the employer and the employee; for example:

> [a]n employer can take no solace in its failure to engage in this process in good faith if what results is an unreasonable or inappropriate accommodation offer.  And an employee who fails to uphold her end of the bargain—for example, by not clarifying the extent of her medical restrictions—cannot impose liability on the employer for its failure to provide a reasonable accommodation.

*Hoppe v. Lewis University*, --- F.3d ----, 2012 WL 3764717, *5 (7th Cir. August 31, 2012) (citations and quotation marks omitted). Ultimately, a reasonable accommodation occurs when an employer "does what is necessary to allow the employee to work in reasonable comfort." *Id.*

Assuming for now that Plaintiff meets the first prong, he fails as to the second and third prongs.  In his affidavit, Plaintiff states that his medical condition was "apparent" to Defendant.  However, he does not provide any admissible evidence in support of this assertion.  As Defendant points out, the record establishes that after Plaintiff was injured, he was placed on light-duty work for a time by his physician.  He was later released to work without any restrictions by that same physician on February 6, 2008.  Plaintiff does not claim that he was under any restrictions from February 6, 2008, to and through the date of his termination, and he does not assert that he told or otherwise

affirmatively made Defendant aware of his disability.  This failure
on Plaintiff's part, coupled with the doctor's diagnosis indicating
that he could return to work immediately with regular duties, did
not put Defendant on notice that Plaintiff had a disability in need
of accommodation.

    Furthermore, Plaintiff states in his affidavit that, because
he performed his required duties for approximately two and a half
years following his back injury, the disability was necessarily
accommodated by Defendant.  In his response brief he argues that
"such obvious ADA accommodation" contradicts Stan Hueni's affidavit
statement that Defendant was unaware of a request for accommodation
made by Plaintiff.  However, Plaintiff provides no details as to
what the alleged accommodation consisted of, how the accommodation
related to his disability, what accommodation he requested of Stan
Hueni or any other supervisor, when he allegedly requested this
unspecified accommodation, or how Defendant failed to reasonably
accommodate his disability.[6]  Nothing in the record shows that
Plaintiff sought an accommodation from Defendant at all.  In fact,
the evidence presented shows that the fax from Plaintiff's doctor

---

[6] Plaintiff seems to be suggesting that Defendant failed to reasonably
accommodate his disability when he was terminated; however, as Defendant
points out, the discharge itself cannot be construed as the failure to
reasonably accommodate him under the facts presented in this case.  See
*Gittings v. Tredegar Corp.*, 2010 WL 4930998, *7 (N.D. Ill. Nov. 29, 2010)("It
distorts the concept of reasonable accommodation beyond all recognition to
suggest that if an employee simply requests continued employment, the denial
of that request—in the form of a termination—may form the basis of an
accommodation claim.")

released him to work with no restrictions.  It is unclear to the Court why, based on the doctor's information and receiving no request for accommodation from Plaintiff, Defendant could or should have provided a reasonable accommodation to Plaintiff.  See *Hoppe*, 2012 WL 3764717 at *5 ("The undisputed evidence in the record shows that [plaintiff] did not provide the [defendant] with the information it needed and requested and [t]he [defendant] therefore is entitled to judgment as a matter of law.")

   *Disability Discrimination*

   A plaintiff may prove disability discrimination either directly or indirectly.  *Dickerson v. Board of Trustees of Community College Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) (citing *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000)).  Here, the Plaintiff chooses to proceed under the indirect method of proof.  Under this method, a prima facie case of discrimination must first be established by providing evidence that: (1) he is disabled pursuant to the provisions of the ADA; (2) he was meeting the legitimate employment expectations of the defendant; (3) he was subject to an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably.  *Id.* (citing *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009).  After a prima facie case has been shown by the evidence, the defendant must present a "legitimate,

non-discriminatory reason for its employment decision." *Id.* (citing *Rooney v. Koch Air, LLC*, 410 F.3d 376, 381 (7th Cir. 2005)). At that point, the burden shifts back to the plaintiff to show, by a preponderance of the evidence, that the defendant's proffered reasons are nothing but a pretext for discrimination. *Id.* "Although intermediate burdens shift back and forth under the *McDonnell Douglas* framework, the ultimate burden of demonstrating that the defendant intentionally discriminated always remains with the plaintiff." *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004).

Here, Defendant argues that Plaintiff has established neither a prima facie case nor pretext of discrimination. It is undisputed that Plaintiff suffered an adverse employment action when he was terminated. Assuming for purposes of this section that Plaintiff is disabled under the ADA,[7] he still fails to establish the necessary prima facie case. First, Plaintiff does not point to any similarly situated employees who were treated more favorably than him. As noted in more detail in the Title VII section above, Plaintiff cites to his own affidavit as well as that of Stan Hueni

---

[7] As noted in a previous footnote, effective January 1, 2009, Congress amended the ADA to "[reinstate] a broad scope of protection." See ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008). The ADAAA states that "it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations. ..." *Id.* at 3554. Therefore, the "question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id.* In keeping with the clear directive of the ADAAA and recognizing that Plaintiff's claims fail for various other reasons, the Court will not engage in an analysis of Plaintiff's alleged disability.

to show a "trio" of similarly situated non-disabled co-workers who were not terminated.  However, the affidavits in question do not establish the evidence he is attempting to assert in his response brief.  Stan Hueni's affidavit and supporting documents provide only that "at least three employees, two of whom are Hispanic" and one who had "sustained a work-related back injury" received written warnings for failing to report a safety violation.  However, Stan Hueni's affidavit also provides that none of those employees were terminated because they had not committed multiple violations of the work rules in a six-month period.  Plaintiff does not present any evidence to show that a similarly situated non-ADA disabled employee who committed multiple rules violations warranting written reprimands over a six-month period was allowed to continue working rather than being terminated.  In fact, Plaintiff cites to no particular employee whatsoever and provides none of the relevant and necessary details.  See *Atanus*, 520 F.3d at 673 (a plaintiff must establish that "members of the comparative group are directly comparable to [him] in all material respects.")  See also *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) ("We have cautioned that, in order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a "comparable set of failings.")

Plaintiff also fails to show that he was meeting the legitimate employment expectations of the defendant, either with or

without the alleged (but unspecified) accommodations.  He cites
only to his own affidavit to state generally that he was performing
his job duties satisfactorily, but he provides no other evidence to
support this contention.  More importantly, he does not dispute
that he himself testified that he was aware of the stated 80%
production productivity standard, that he consistently (both before
and after his back injury) received direction from Defendant to
increase his production rates, and that in the weeks prior to his
termination he received specific warnings because his rates were as
low as "30, 35, or 45 percent."  He also does not dispute that he
received a written warning on February 16, 2010, stating that his
"grinding rates for February 8-13 were 42% and that is not
satisfactory," nor does he assert that the grinding rate
information contained within the written warning was incorrect.
Based on the record, Plaintiff has not established that he was
meeting Defendant's legitimate employment expectations during the
period preceding his termination.  See *Dickerson v. Board of
Trustees of Community College Dist. No. 522*, 657 F.3d 595, 603 (7th
Cir. 2011) (plaintiff's discrimination claim was not able to
survive summary judgment because his "own evaluation of his work"
could not properly be imputed to defendant).  Thus, for the reasons
stated above, Plaintiff has failed to establish a prima facie case
of discrimination, and his claims fail as a matter of law.

Furthermore, even assuming that Plaintiff had been able to present a proper prima facie case, he does not provide sufficient evidence of pretext. Defendant has articulated a legitimate, non-discriminatory reason for terminating Plaintiff -- namely that he had two active written warnings and then committed an additional safety violation by not reporting a work-related injury. As noted above, in his affidavit, Plaintiff denies that he was injured while stand grinding and further denies that he failed to tell anyone about the "non-event." He asserts that Defendant's position that he was terminated because of these violations is pretextual, but he does not expand upon this assertion in any meaningful manner. In any event, Plaintiff fails to acknowledge that his own deposition testimony establishes that, during the February 16, 2010, meeting, Plaintiff told Stan Hueni that he had hurt his back while grinding and admitted that he didn't do what he was supposed to do to report the incident. Therefore, to the extent that Plaintiff is claiming that Defendant's proffered reason is an unsupported "lie rather than an oddity or an error," this claim is contradicted by the record. *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008); see also *Filar v. Bd. of Educ. of City of Chicago.*, 526 F.3d 1054, 1063 (7th Cir. 2008) (pretext requires "[p]roof that the defendant's explanation is unworthy of credence.")

Although Plaintiff points vaguely to an allegedly flawed translation by Pedro Lopez and the fact that the final meeting was

not video or audio recorded as further evidence of pretext, these assertions are not supported by the record (as is described in detail above in the Title VII section) nor do they in any way point to disability based discrimination as the true reason for Plaintiff's termination.  Even assuming that the translation of Pedro Lopez was flawed in some way, Plaintiff does not provide any evidence to suggest that Defendant's reliance on the translation was ill-considered or unreasonable.  In sum, Plaintiff presents no admissible evidence that would allow a reasonable jury to infer that the true reason for Defendant's termination of Plaintiff was based on a prohibited discriminatory animus; thus, he has not established that any pretext existed.  See *Benuzzi v. Board of Educ. of City of Chicago*, 647 F.3d 652, 663 (7th Cir. 2011) (citing *McGowan v. Deere & Co.*, 581 F.3d 575, 581 (7th Cir. 2009)(a plaintiff "must do more than simply allege that an employer's stated reasons are inaccurate; [s]he must still have some circumstances to support an inference that there was an improper motivation proscribed by law")); see also *Yindee v. CCH Inc.*, 458 F.3d 599, 602 (7th Cir. 2006) ("It is not enough to demonstrate that the employer was mistaken, inconsiderate, short-fused, or otherwise benighted; none of those possibilities violates federal law.")

<u>CONCLUSION</u>

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED**.  The Clerk is **ORDERED** to **DISMISS THIS CASE WITH PREJUDICE.**


DATED: September 28, 2012          /s/RUDY LOZANO, Judge
                                   United States District Court